You may proceed. Good morning, Your Honor. This is Jeffrey Dickerson appearing on behalf of the appellant, which is now, I assume the Court's going to grant the motion, the estate of Robert Wilson. Well, we'll take it under consideration. One preliminary question I had is I noted that it was filed in Fremont, Idaho. Is that right? That's where she lives, yes. I see. Nevada has a survival statute that would allow the estate to assume the claim for the damages of the decedent as it relates to emotional distress and the financial loss as a result of the denial of merit increase that's alleged in this case, Your Honor. Well, there's the analog in many state statutes don't allow a defamation case or invasion of privacy case to go forward postmortem. Has Nevada taken any position on that? Do you know? It seems to me that I've been through this issue with a police shooting case that was in front of this court. Well, that would clearly survive, it seems to me. Defamation? Defamation? I don't know. And the reason I ask is that this seems more akin to a defamation case than, say, an excessive force case. Well, if we want further briefing on that, we'll ask you. We'd be glad to do that, Your Honor. But your position is Nevada law controls and not Idaho law? Yes, Your Honor. Even though it's being probated in Idaho? The question is whether the decedent who was employed in pursuing his claim in Nevada, whether or not Nevada law I think Nevada law would be in a choice of law analysis would come down as because it's a procedural issue as it relates to the ability of the estate to assume the place of the plaintiff. It seems to me that it's a Rule 25 type of issue. Okay. And why do you think your motion is timely? Well, there's good cause for an extension of time beyond the 90 days, Your Honor, that I can show with affidavit from counsel in Idaho. My request of them to get going was timely following the suggestion of death on the record in this case. And as I represented to the court, I thought I needed two more weeks to get that accomplished. It obviously took more than that. But this was not my doing. It was something to do with the probate court and getting the paperwork to the probate court. As you can see, it's a special appointment situation. And I don't know why it took so long to get that done. But the request was timely made of counsel up there. Let's proceed to the merits. Thanks for this preliminary. Okay, Your Honors. If we start with the district court's order, it appears to me that the district court did two things. One is it hit the public concern analysis through the Garcetti v. Sabala's case and found that he was exercising speech within the scope of his job duties, and therefore he was acting not as a citizen but as an employee and therefore wasn't protected, and then did a safety net argument that said, one paragraph that said, there was just cause, if you will, for the activity towards him because the Department of Wildlife issued a ban on him from entering that particular area. Working backwards, the ban on that particular instance came after the second incident where he had spoken out with respect to the goat herder lady. And that particular activity has nothing to do with the adverse action as it relates to the performance evaluation. So the district court's rationale there skipped over, doesn't reach back, if you will, to the first adverse action that we're claiming in this case. It only touches upon the written reprimand. With respect to the written reprimand, we have put forth in our brief various facts that we think demonstrate that there's an issue of fact as to whether or not there is causation, if you will, which I think is what the district court was talking about there, whether there is causation. And even if the district court was talking about the merits of the written reprimand, there is sufficient evidence in the record to contest that as a matter of fact. In other words, could a reasonable juror look at the reprimand and the circumstances surrounding it and conclude that it was a pretext? If you take plaintiff's deposition testimony on what he said and what was actually said in the field, if you look at things such as he was denied a pre-disciplinary hearing by the dean, that she tried to hamper his reconsideration efforts, and that she didn't bring eyewitnesses to the hearing, the grievance hearing, with respect to when it was her burden of proof there to substantiate that, that all of these things come together to cause a reasonable juror to be able to go either way on that particular issue. So then working back from that to the Garcetti issue that the trial court addressed, Garcetti was not raised in the opening brief below. It's my view that the district court came up with that one on its own. Now, this court has the issue before it. That's a question of law. It's part of the question of law as to whether or not this speech is on a matter of public concern. But the moving brief below didn't even address the public concern element before Garcetti. But we do review the district court order and not the preliminary papers. Of course. I think it's squirrelly in front of us, it would seem to me. Well, I think that we've put some law in the brief, at least in the reply brief before you, Your Honors, that it's unfair to raise things for the first time in reply, and it's unfair for a district court without an opportunity to respond to raise some sort of legal point like Garcetti without giving us an opportunity to brief it below. That aside, we've put before the court facts that demonstrate that this was not part of his job duties. His job duties as a cooperative extension educator, a faculty member, 75 percent of that was teaching, and 25 percent of that was research. And the way he would do his work would be to interact in the local Ely area, and this particular refuge is quite a distance away from that particular area. He did not have a duty to go teach NDOW's area director as to how to run the refuge or how to deal with weeds. It was... Well, that's true. But, you know, cooperative extension agents at a land-grant university or college have a fairly broad charter to go out and essentially deal with the public, try to educate. I mean, my reading, unless you can correct me, of the job responsibilities is a little broader than you've described. Well, I think your characterization is absolutely accurate. I'm not contesting that. I mean, it's different from a pure faculty member. For example, if he had been 100 percent teaching and wrote the letter, it seems to me you've got a much better claim. But as his duty is to essentially not educate, well, educate and, to a certain extent, be a goodwill ambassador for the university, then what he says to people that arguably is in the course of his duties becomes a little more important, wouldn't you say? Yeah, but I think this is more of a characterization of, I think is something to consider here, of what he's doing, is more of a reporting of neglect, if you will, as opposed to an educating type of encounter. It's not, hey, here's how you do it. It's, boy, you came down hard on him. You know, you're not doing it right. I'm incensed. This is crazy. So on and so forth. And it was more of a substantive rant, if you will, than an educational dialogue between the two. It was a letter written to. He was trying to educate them. He was. He got the message across, Your Honor. But if you go to the first question. But in all seriousness, I mean, if, for example, he was dealing with a farmer, a rancher, whatever, and they made the same statements in the context of an education visit, I think, why wouldn't that be a legitimate part of an adverse employment review? Well, we don't have that. I'm dodging the question. I think that in that situation you'd have it. But here we don't. It's more akin to a report of misconduct to the upper levels of the department about what's going on at a lower level at the area manager. It's more akin to the police officer cases that we've cited, who as a result of them being police officers, you know, they see this and they know that it's wrongdoing, and they report it in an internal affairs setting, and the courts there, at least the district courts that have considered it, but more important, the Maribel v. Nickman case, which is a recently decided case in December of 2007 by the circuit, 5-11, Fed 3rd, 924. In December 26th of 2007, there was an engineer whose job was to run the engine room in a ferry up in Washington in Puget Sound, and he reported corrupt activities on the part of his supervisors, and this court in that panel determined that that was not part of his job duties. And I think the same is true here. His job duties at an official level were, as you've indicated, but not to go so far as to say that his job was to tell NDAO upper management that its lower people were neglecting their duties at the local level. Of what significance is it that he used his business letterhead? Well, I think there's some confusion there because he also indicated that he was writing as the chair of the Tri-County Commission on Weed Eradication or something like that. So I can't remember his testimony on that. I should have that, but I think that's discussed somewhere in the record, Your Honor, his testimony about his explanation for that because he was asked that at deposition. Okay. My initial questions took you into your time, so we'll give you some time for rebuttal. Thank you, Your Honor. Good morning. Mary Phelps Dugan on behalf of appellees Dean Hinton, President Lilly, and Provost John Frederick. I'd like to address the 2001 letter that Mr. Wilson wrote to Doug Hunt at the Nevada Division of Wildlife because it demonstrates that he was clearly writing as part of his official duties as an extension educator with cooperative extension at the University of Nevada, Reno. If you look at the letter, which is in the record at 7273, it's clearly on extension letterhead. His signature, below the signature it states extension educator. If you read the letter, he's clearly trying to educate NDOW about how to handle these weeds. He explains that the weeds are a problem. He recommends a multifaceted approach. He says what to do and what not to do. He says where to spend the money first, and if you have more money, then where to spend that money. He says when to use Roundup and when not to. He's clearly trying to tell these people how to handle this weed infestation problem. What did he make of the initial sentence? I'm the director of the Tri-County Weed Management Program. Well, he's simply informing them that. But you know what? His work as the Tri-County Weed District is listed in his evaluation as among his duties. If you look at the record at page 82, he's listing in his evaluation, I conducted the following educational programs to meet the needs of maintaining rangeland health and a strong natural resource-based economy. Invasive weed management, that's exactly what this letter was attempting to do, and spearheaded effort to form Tri-County Weed District. That's at the record at pages 82 and 83. Well, really, except for the fact that he's telling them they should be ashamed of the condition, the rest of the letter's pretty good, wouldn't you say? And that's exactly what Jerry Buck, his supervisor, said. Look, your job is to teach these people. Your job isn't to offend them. But certainly, when he was writing this letter, it was part of his job. He just went too far. And it was appropriate for his supervisor to call him on the carpet for it, which, in fact, she barely did. She mentioned in his evaluation that his interactions with the county had not been good. She rated him unsatisfactory based on additional information that his own supervisor included in the evaluation, and that had to do with this letter. His role as the Tri-County Weed Control Committee was unclear, and his supervisor had asked him on numerous times to explain that better. And then there was the issue of his mileage reimbursement. If you look in the record at pages 92 to 93, those are the three issues that his immediate supervisor, Jerry Buck, mentioned in his evaluation that his peers had not mentioned. And Dean Hinton caught up on those in conjunction with the immediate supervisor, and they both rated him unsatisfactory. But there's no doubt that he was writing this letter as an extension educator. He testified to that on page 42 of the record, lines 15 through 18. He testified that he wrote the letter as an extension educator. I've already mentioned that he took credit for it in his evaluation, and he made admissions and deposition testimony that he shouldn't have written it the way he did. At page 44, with respect to the statement that Mr. Hunt should be ashamed, he admitted that the tone of his statement was inappropriate. Yes, and it's clear he apologized for that in the subsequent letter. Right, right. But the fact of the matter is he admitted that his tone was inappropriate, that he shouldn't have done it. He admitted that his tone angered NDOW at page 46, that it was unprofessional at page 47, that it hurt his credibility at page 48, and that he, quote, fully deserved some sort of chastise for writing that first letter. And that's at page 54. So he acknowledged that the tone of his letter was inappropriate, condescending, and unprofessional, that he shouldn't have done it, and he apologized for it. There was nothing wrong with Dean Hinton or his immediate supervisor, who wasn't sued in this matter, in mentioning it in his evaluation. And it was only one of the factors that led to him getting an unsatisfactory in his evaluation as opposed to a satisfactory. I'd like to move to the goat herder incident. This is the incident where he was speaking to Judy Petty and then later about her. And this speech was also not protected. It was made in the course of his work as an extension educator. One of his primary jobs was teaching Nevada Invasive Weed Management Program. Now, this was in 2003 that this incident occurred. And in his 2003 role statement, which is excerpted in the record at 140, he states one of his teaching topics, Nevada Invasive Weed Management Program. He also states at that same page that his target audiences included resource managers, state agencies, ranchers, and the general public, like Judy Petty. He met with Petty to discuss contracting her goats to do weed control in Railroad Valley. So that's in the record at 122. During his conversation with Miss Petty, he became very angry. It was reported that he was hollering at her, and she became extremely upset. In fact, she became so upset that she thought she was doing something wrong, and she called Dana Johnson with Nevada Division of Wildlife to figure out if she had messed up because Mr. Wilson's reaction to her was so extreme. From that interaction with Dana Johnson, Dana Johnson was upset as well, and he contacted Mr. Wilson. And it was at that time that the plaintiff told him this comment about Miss Judy Petty, that she was a stupid goat herder, et cetera. These things led to numerous communications about Mr. Wilson and his ability to work any further on the wildlife management area. As I mentioned, Dana Johnson called the plaintiff. Dana Johnson wrote to the administrator for NDOW complaining about the incident. Ron Mills, who heard about the incident, wrote also to complain about that incident as well as other problems they had with Mr. Wilson. And finally, the administrator of NDOW, Mr. Crawforth, wrote to Dean Hinton to identify the restrictions on Mr. Wilson's future contacts with the wildlife management area. He stated that Mr. Wilson would not be allowed on the wildlife management area without first contacting the area director in writing, asking permission, identifying the nature of the visit, the content of the visit, and the approximate time of the visit, and then waiting. He would have to see if he was actually approved to enter the management area. So Mr. Wilson's abilities to do his job and check on the wildlife management area to give guidance about the weed infestation problem, which he had listed in his evaluations in 2001 and was part of his rule statement in 2003, was impeachable. And if he didn't get approval, then he wasn't going to be able to do his job. So clearly these people who had heard about Mr. Wilson's behavior through Judy Petty, Dana Johnson, Crawforth, and Ron Mills all thought that Mr. Wilson was working as part of his job because they contacted his supervisor when they had a problem with him. And he was working as part of his job. This was his job. This is what Cooperative Extension does. They use research-based education in the community, whether it's with local agencies, state agencies, federal agencies, individuals, whether it happens in the field, in the barn, in the sheep shed, or wherever. This was part of his job. And to argue otherwise is really rather incredulous, in my opinion. In any event, in both of these instances, plaintiff was acting pursuant to his official duties as an extension educator, and as a result his speech was not protected. Judge Dawson did mention the Pickering balancing test, and I believe on the whole applying that test to both of these incidents still results in the Dean Hinton's and President Lilly's and Provost Frederick's actions not being constitutional violations. In the first instance, as a result of the first letter that the plaintiff wrote, Mr. Crawforth wrote a letter to Dean Hinton, and that's in the supplemental record of pages 25 and 26. At the end of that letter, Mr. Crawforth says, I would like to assure you that Mr. Wilson will not be invited to participate in any division of wildlife programs in the future. So here's a disruption of the working relationship between Cooperative Extension and their student client, NDOW. As a result of the second incident with Judy Petty, as we know, Administrator Crawforth required Mr. Wilson to stay out of the wildlife management area unless he had written permission to go there. Again, this is a disruption of the relationship between the student client and the teacher. What happened basically is that the student fired the teacher, and that was Mr. Wilson. We believe that Judge Dawson's order should be upheld and that there were no constitutional violations in these facts. I have no more comments. Thank you, Counsel. Put on two minutes for rebuttal. We'll give you two minutes because that's about the preliminary time I took. I didn't want to eat into your time on my questions about the estate. It's fair to do that, Your Honor, but I appreciate the time. Sir, what use would an extension agent be who'd been thrown off a significant portion of public lands in a western state? I'm sorry, what was the first part? What use would an extension agent be who'd been thrown off of public lands, a significant portion of public lands in a western state? Well, he was only thrown off that refuge, and he wasn't thrown off. He could get access if he went and asked permission. And there's a reasonable inference that he would have gotten that permission because the letter that he wrote was written in cohort with that particular area manager who wanted that letter to go out so that he could have the funding that enabled him to address the re-eradication problem. But back to the geographic scope of his efforts, I think it was limited to this Kirsch Wildlife Refuge, not to public lands everywhere. And White Pine County and the tri-counties out there is a huge area. I mean, we're talking the size of Oregon. Well, not that big, but pretty close. But with respect to the... We'll not get to thinking about our home state here. But with respect to the Garcetti issue, Your Honor, one more point. If we accept the plaintiff's argument that it was a content-based attack in terms of the adverse action, and if we look at the performance evaluation itself and if we see that what he's being grilled on is he said, and she's quoting him from the letter, as a manager responsible for public lands within Nevada, you should be ashamed of the condition of this refuge. After listing several recommendations, he said, quote, if that cannot be done, the lands rightfully should be returned to the private sector where economics will dictate that invasive weed species are addressed. Close quote. I explained to Bob, this is the dean talking, the negative effects this letter had on his credibility. So if she's saying what you did was wrong, she's saying that that's not part of his job duties. Well, it's actually talking about, it seems to me, how he's performing his job duties, his method of communication. Well, again, I began my point by saying we think that that's direct evidence that the content of the speech was the target of the dean, not the form in which it was conveyed. Well, nobody ever said he was wrong. They just didn't like the way he said it, I gather. Our theory of the case is they didn't like what he said. Well, they'd be talking about Russian knapweed and all that. Nobody disputes that there was a bunch of knapweed on that refuge, do they? But his ability to draw the correct conclusions about the management of it and what's needed to fix it is a coincidence of his job duties, which he shared with the higher-ups in the department, which is an outside agency. I mean, all of the case law in the circuit since Garcetti is addressed internal, that I'm aware of, is addressed internal reporting and trying to ferret out whether or not the Freetag case, the Maribel case, all that's internal. But here he's going outside of his own agency, way outside of his chain of command to a different agency, and not only that, but to the higher-ups of that agency beyond the wildlife refuge. And so I think he's taking his report way away from his job duties. Thank you. Let's try to add some questions. No, that's fine. Okay. Thanks. The case just heard will be submitted. The next case on the oral argument calendar, Martinez-Madera v. Mukasey.
judges: Trott, Thomas, Hogan